UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PENINSULA COMMUNITY HEALTH
SERVICES,

                          Plaintiff,

          v.

OLYMPIC PENINSULA HEALTH
SERVICES PS, et al.,

                          Defendants.

CASE NO. C20-5999 BHS

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT

This matter comes before the Court on Defendants Olympic Peninsula Health

Services and Ann and John Doe Failoni's (collectively "OPHS") motion for summary

judgment, Dkt. 36, and Plaintiff Peninsula Community Health Services' ("PCHS")

motion for partial summary judgment, Dkt 39. The Court has considered the briefing

filed in support of and in opposition to the motions and the remainder of the file and

hereby rules as follows.

## I.   FACTUAL & PROCEDURAL BACKGROUND

This case involves a trademark dispute between health services providers in

Western Washington. PCHS is a nonprofit provider of medical, dental, behavioral health,

substance use treatment, and pharmacy services. Dkt. 64, ¶ 3. PCHS has clinics in Bremerton, Belfair, Shelton, Kingston, Port Orchard, Poulsbo, and Silverdale, as well as school-based and mobile clinics, and serves Kitsap County, Mason County, and the Olympic Peninsula. *Id.* PCHS alleges it began using its trade name, PENINSULA COMMUNITY HEALTH SERVICES, as early as 1987, and adopted the following design mark as early as July 1, 2000:



*Id.* ¶¶ 11, 12.

OPHS is a for-profit provider of treatment for opioid use disorder and medication-assisted treatment for alcohol use disorder. OPHS has clinics located in Port Angeles and Port Hadlock, and serves Clallam County, Jefferson County, and the Olympic Peninsula. *Id.* ¶ 4. OPHS began using its trade name, OLYMPIC PENINSULA HEALTH SERVICES, and adopted the following design mark sometime after January 1, 2018:



*Id.* ¶ 13.

PCHS asserts that it has been the substantially exclusive, continuous user of its trademarks in Kitsap County, Pierce County, Mason County, and other parts of the Olympic Peninsula in connection with healthcare services. *See* Dkt. 39 at 3. It further states that it is a well-known member of its local community and is a leading provider of healthcare services in Kitsap County and Mason County. *See, e.g.*, Dkt. 25, ¶¶ 4–6; Dkt. 18, ¶ 11. For example, in 2017, PCHS served 29,030 patients who made 103,567 visits to PCHS-branded facilities. Dkt. 18, ¶ 9. It received more than $27 million in income and more than $5 million in government grants and volunteer donations that year. *Id.* Jennifer Kreidler-Moss, Pharm.D., the Chief Executive Officer of PCHS, declares that PCHS's annual revenue, clinic locations, and patient numbers have only grown since 2017. *Id.*

Both PCHS and OPHS provide substance use disorder treatment services, though PCHS provides additional, more extensive and varied medical services. *Compare* Dkt. 16-1, Ex. B, at 5–6 (detailing PCHS's services connected with its mark) *with* Dkt. 13, ¶ 10 (detailing OPHS's services connected with its mark). OPHS asserts that it does not compete for the same patients as PCHS "because [OPHS] offers primarily different services to different individuals out of different clinic locations that are geographically distinct." Dkt. 36 at 10; *see also* Dkt. 13, ¶ 12. OPHS additionally asserts that it is not aware of any instance of confusion between OPHS and PCHS since it started in January 2018. Dkt. 13, ¶ 13; Dkt. 14, ¶¶ 4–5. PCHS, on the other hand, highlights that both parties provide medical and substance use treatment services in overlapping geographic markets and argues that they compete for patients. *See, e.g.*, Dkt. 50 at 6–7.

1    PCHS commenced this action in October 2020, claiming unfair competition and

2    false designation of origin in violation of 15 U.S.C. § 1125(a), trade name infringement,

3    infringement of PCHS's registered trademark in violation of RCW Ch. 19.77, and

4    violation of Washington's Consumer Protection/Unfair Business Practices Act, RCW Ch.

5    19.86. Dkt. 1; *see also* Dkt. 64 (operative amended complaint).

6    In April 2021, OPHS moved for summary judgment on all of PCHS's claims,

7    arguing that it cannot maintain its claims as a matter of law because its mark is not

8    protectable and, even if it is, because there is no likelihood of confusion. Dkt. 12. The

9    Court denied the motion without prejudice and granted PCHS's Rule 56(d) continuance.

10   Dkt. 32. PCHS then moved to voluntarily dismiss Defendants Atif Mian, M.D., and his

11   spouse without prejudice, Dkt. 33, and moved for leave to amend its complaint to

12   eliminate its claim for damages, Dkt. 45.  The Court granted both motions but dismissed

13   the Mian defendants with prejudice. Dkt. 62.

14   OPHS now renews its motion for summary judgment, arguing that there is no

15   trademark infringement as a matter of law because PCHS's mark is generic or descriptive

16   lacking secondary meaning and because there is no likelihood of confusion between the

17   two marks. Dkt. 36. OPHS further argues that, because there is no trademark

18   infringement, PCHS's remaining claims should also be dismissed. *Id.* PCHS, on the other

19   hand, moves for partial summary judgment on the issue of whether its mark is valid and

20

21

22

1  protectable, arguing that its mark is not generic and has acquired secondary meaning.[1]

2  Dkt. 39.

## II.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must

---

[1] PCHS additionally filed an unopposed motion to seal in connection to its response to OPHS's motion for summary judgment. Dkt. 49. That unopposed motion is **GRANTED**.

1    meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

2    U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual

3    issues of controversy in favor of the nonmoving party only when the facts specifically

4    attested by that party contradict facts specifically attested by the moving party. The

5    nonmoving party may not merely state that it will discredit the moving party's evidence

6    at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

7    *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

8    nonspecific statements in affidavits are not sufficient, and missing facts will not be

9    presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

10   **B.    Trademark Infringement**

11          "The Lanham Act provides national protection of trademarks in order to secure the

12   owner of the mark the goodwill of his business and to protect the ability of consumers to

13   distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,

14   469 U.S. 189, 198 (1985). A Lanham Act claim requires proof that "(1) trademark is a

15   valid, protectable trademark; (2) [the plaintiff] owns the trademark; and (3) the opposing

16   party used the trademark or a similar trademark without consent in a manner likely to

17   cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or

18   approval of goods." *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, 413 F. Supp. 3d

19   1032, 1045 (W.D. Wash. 2019) (citing *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196

20   (9th Cir. 2009)). "Because of the intensely factual nature of trademark disputes, summary

21   judgment is generally disfavored in the trademark arena." *Entrepreneur Media, Inc. v.*

22

1    *Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (internal quotation omitted). The parties

2    dispute the first and third elements.

3         **1.**     **Valid, Protectable Trademark**

4         The parties have filed cross-motions for summary judgment on whether PCHS's

5    mark is valid and protectable. *See* Dkt. 36 at 12–14 (OPHS); Dkt. 39 (PCHS). PCHS

6    argues that its mark is not generic and has attained a descriptive, secondary meaning,

7    while OPHS argues the inverse.

8         "There are five categories of trademarks: (1) generic; (2) descriptive; (3)

9    suggestive; (4) arbitrary; and (5) fanciful." *Yellow Cab Co. of Sacramento v. Yellow Cab*

10   *of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005) (citing *KP Permanent Make-Up,*

11   *Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005)). The latter three

12   categories are inherently distinctive and automatically entitled to protection because they

13   naturally function to identify the particular source of a product. *Id.* (quoting *KP*

14   *Permanent Make-Up*, 419 F.3d at 602). "Descriptive marks 'define a particular

15   characteristic of the product in a way that does not require any exercise of the

16   imagination.'" *Id.* (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632

17   (9th Cir. 2005)). "A descriptive mark can receive trademark protection if it has acquired

18   distinctiveness by establishing 'secondary meaning' in the marketplace." *Id.*

19   (citing *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th

20   Cir. 1999)). "Generic marks are not capable of receiving protection because they identify

21   the product, rather than the product's source." *Id.* (quoting *KP Permanent Make-Up*, 408

22   F.3d at 602).

1        **a.      Generic**

2          "A 'generic' term is one that refers, or has come to be understood as referring, to

3    the genus of which the particular product or service is a species. It cannot become a

4    trademark under any circumstances." *Filipino Yellow Pages*, 198 F.3d at 1147 (internal

5    quotation omitted). In determining whether a mark is generic, courts rely on the "who-

6    are-you/what-are-you" test: "A mark answers the buyer's questions 'Who are you?'

7    'Where do you come from?' 'Who vouches for you?' But the [generic] name of the

8    product answers the question 'What are you?'" *Id.* (internal quotation omitted) (alteration

9    in original). For a compound term, like PENINSULA COMMUNITY HEALTH

10   SERVICES, courts consider "the term's meaning as a whole, not its parts in isolation."

11   *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298, 2304 (2020).

12         Federally registered trademarks enjoy a strong presumption that they are not

13   generic. *Bluetooth SIG, Inc. v. FCA US LLC*, 463 F. Supp. 3d 1169, 1185 (W.D. Wash.

14   2020). PCHS's mark is not a federally registered trademark but is registered in

15   Washington State.[2] *See* Dkt. 41, Ex. D, at 21–22. PCHS's registration of its mark with

16   Washington is certainly strong evidence of its protectability under state law, but it is

17   unclear whether the Court can make such a presumption in considering PCHS's Lanham

18   Act claim. The Court assumes, without deciding, that the evidence of registration with the

19   State is significant evidence that PCHS's mark is not generic.

20

21         [2] State law establishes that such registration is prima facie evidence of, *inter alia*, the
     registrant's "exclusive right to use the trademark in this state in connection with the goods or
22   services specified in the certificate." RCW 19.77.040(3).

1    Whether a mark is generic can be established by evidence of: (1) "generic use by

2    competitors of the mark that has not been contested by the owner of the mark"; (2)

3    "generic use of the trademark by the proponent of the trademark"; (3) "dictionary

4    definitions to determine public usage"; (4) "generic usage in the media of the trademark,

5    such as in trade journals and newspapers"; (5) "testimony of persons in the trade"; and

6    (6) "consumer surveys." *Calista Enters. Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099,

7    1116 (D. Or. 2014) (internal citations omitted).

8    OPHS argues that the combined term PENINSULA COMMUNITY HEALTH

9    SERVICES is generic because it refers to the type and location of services, answering the

10    "What are you?" question and not the "Who are you?" question. OPHS further asserts

11    that the combination of three generic terms, "Peninsula," "Community," and "Health

12    Services," creates only a generic term. In support of these arguments, OPHS documents

13    "literally hundreds of uses" of these terms, both in isolation and in combination. Dkt. 57

14    at 10; *see also* Dkt. 16-1, Exs. F–J, at 30–97. There are approximately forty Washington

15    businesses that use "Peninsula" and "Community" or "Health" or "Services" in their

16    business names. Dkt. 16-1, Ex. J, at 96–97. It further asserts that there is an identical

17    Peninsula Community Health Services operating in Alaska and that PCHS has never

18    disputed this third party's use.

19    The Court must consider PCHS's whole mark, not just its parts in insolation.

20    *Booking.com B.V.*, 140 S. Ct. at 2304. The fact that PCHS has successfully registered its

21    mark with the State of Washington is significant evidence that its mark is not generic.

22    Moreover, there is no evidence that PCHS itself uses its trademarks generically or that

1    the media uses the trademarks generically. Neither party provides a consumer survey, but

2    such evidence is not required to prove genericness. *See id.* at 2307 n.6 ("Evidence

3    informing [the genericness] inquiry *can* include not only consumer surveys, but also

4    dictionaries, usage by consumers and competitors, and any other source of evidence

5    bearing on how consumers perceive a term's meaning." (emphasis added)).

6          While OPHS has presented evidence of a third party using a nearly identical name,

7    Failoni, OPHS's CEO, testified that she was not aware of any other healthcare provider

8    called Peninsula Community Health Services and that the term "Peninsula Community

9    Health Services" refers to PCHS and does not refer to anything else. Dkt. 41, Ex. B,

10   Deposition of Ann Failoni ("Failoni Dep."), at 72:6–10, 71:5–9. Further, the Court notes

11   that the entire legal name of the third party is "Peninsula Community Health Services of

12   Alaska, Inc." Dkt. 38-1, Ex. N, at 3. OPHS has failed to present evidence to create a

13   genuine dispute of material fact on genericness. The majority of the factors and the

14   evidence support the conclusion that PCHS's mark is not generic, and the Court

15   determines that no reasonable fact finder would find otherwise. PCHS's mark answers

16   the "Who are you?" question and is not generic as a matter of law.

17         PCHS's motion for partial summary judgment is therefore GRANTED as to this

18   issue, and OPHS's motion for summary judgment on this issue is DENIED.

19              **b.    Secondary Meaning**

20         Even though PCHS's mark is not generic, in order to be protectable, its mark must

21   be descriptive and have acquired a secondary meaning. *See Yellow Cab Co. of*

22   *Sacramento*, 419 F.3d at 927. "To establish that a descriptive term has secondary

1   meaning, the plaintiff must show that the primary significance of the term in the minds of

2   the consuming public is not the product but the producer." *Transgo, Inc. v. Ajac*

3   *Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985) (internal quotation

4   omitted). In determining whether a descriptive mark has acquired a second meaning

5   warranting protection, courts consider several factors:

> (1) whether actual purchase[r]s of the product bearing the claimed
> trademark associate the trademark with the producer, (2) the degree and
> manner of advertising under the claimed trademark, (3) the length and
> manner of use of the claimed trademark and, (4) whether use of the claimed
> trademark has been exclusive.

9   *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (en banc)

10   (internal quotation and citations omitted) (alteration in original).

11       In support of its motion, PCHS provides declarations from "lifelong consumers of

12   healthcare services" who declare that "PCHS is recognized as a major provider of

13   healthcare services; it is highly visible; and it is well-known." Dkt. 39 at 14 (citing Dkts.

14   20–24, 26–27). PCHS further asserts that it had continuously used its trade name and

15   logo in marketing efforts for almost eighteen years when OPHS opened in 2018.

16   "Evidence of use and advertising over a substantial period of time is enough to establish

17   secondary meaning." *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 517 (9th

18   Cir. 1989) (internal citations omitted). It additionally asserts that, in 2017, it served over

19   29,000 patients who made over 100,000 visits to PCHS-branded facilities. In sum, PCHS

20   argues that because it is one of the largest healthcare providers in Kitsap County, Mason

21   County, and other parts of the Olympic Peninsula, its mark is descriptive and has

22   acquired a secondary meaning.

1    OPHS argues that PCHS has failed to provide objective evidence of acquired

2    secondary meaning and has failed to prove a causal link between its many patients and its

3    mark. OPHS asserts that the ten declarations PCHS provides in support of its motion are

4    from "partisan, wholly non-credible sources." Dkt. 57 at 17. Indeed, it appears that all of

5    PCHS's declarants are connected to PCHS in some way. *See id.* at 17 n.1. Bruce Yoder,

6    for example, declares that when he would mention the name "PCHS" or "Peninsula

7    Community Health Services," his patients would know that he was referring to PCHS and

8    did not ask follow-up questions. Dkt. 20, ¶ 6. Yoder volunteers with PCHS's Quality

9    Management Compliance Committee. *Id.* ¶ 3. The declarations also raise hearsay

10   concerns if PCHS intends to offer the declarants' testimony to prove the truth that others

11   in the community associate the mark with PCHS.

12   The Court may not determine these declarants' credibility or bias towards PCHS

13   on summary judgment, leaving questions of material fact as to whether consumers in fact

14   associate PCHS's mark with the producer. *See Self-Realization Fellowship Church v.*

15   *Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) ("Trademark law is

16   skeptical of the ability of an associate of a trademark holder to transcend personal biases

17   to give an impartial account of the value of the holder's mark."); *SEC v. Koracorp Indus.,*

18   *Inc.*, 575 F.2d 692, 699 (9th Cir. 1978) ("[S]ummary judgment is singularly inappropriate

19   where credibility is at issue.").

20   There are ultimately questions of fact as to whether PCHS's mark has acquired a

21   secondary meaning entitling it to protection under the Lanham Act. PCHS's motion for

22

1    partial summary judgment and OPHS's motion for summary judgment on this issue are,

2    therefore, DENIED.

3        **2.      Likelihood of Confusion**

4        Even if PCHS's mark is a valid, protectable trademark, in order to succeed on its

5    Lanham Act claim, it must also establish that OPHS "used the trademark or a similar

6    trademark without consent in a manner likely to cause confusion among ordinary

7    consumers as to the source, sponsorship, affiliation, or approval of goods." *BBC Group*

8    *NV LLC*, 413 F. Supp. 3d at 1045 (citing *Lahoti*, 586 F.3d at 1196). OPHS argues that,

9    even if PCHS's mark is protectable, PCHS cannot establish that there is a likelihood of

10   confusion between the two marks.

11       "Likelihood of confusion is a factual determination," and courts often find

12   likelihood of confusion is best determined by the factfinder. *Fortune Dynamic, Inc. v.*

13   *Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1031 (9th Cir. 2010) (quoting

14   *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002)). Yet courts

15   have determined on motions for summary judgment that there is no likelihood of

16   confusion as a matter of law. *See, e.g.*, *New Flyer Indus. Can. ULC v. Rugby Aviation,*

17   *LLC*, 405 F. Supp. 3d 886 (W.D. Wash. 2019). Courts use the eight *Sleekcraft* factors to

18   assess likelihood of consumer confusion among similar trademarks, assessing:

19       (1) the similarity of the marks; (2) the strength of the plaintiff's mark;
         (3) the proximity or relatedness of the goods or services; (4) the defendant's
20       intent in selecting the mark; (5) evidence of actual confusion; (6) the
         marketing channels used; (7) the likelihood of expansion into other
21       markets; and (8) the degree of care likely to be exercised by purchasers of
         the defendant's product.

22

*Fortune Dynamic, Inc.*, at 1030–31 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.3d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)). "This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts" for analysis. *Id.* (internal quotations omitted).

### a.    Similarity of the Mark

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis. Together with the relatedness of the services and the use of a common marketing channel, this first factor constitutes part of the controlling troika in the *Sleekcraft* analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (internal citation omitted). The marks "must be considered in their entirety and as they appear in the marketplace[.]" *Id.* at 1206 (citing *Filipino Yellow Pages*, 198 F.3d at 1147–50). Similarity is "adjudged in terms of appearance, sound, and meaning," and "similarities are weighed more heavily than differences." *Id.* (internal citations omitted).

The marks are similar in that the two trade names share three words—PENINSULA, HEALTH, and SERVICES—and the two logos both have images of similar evergreen trees in the same color. Further, the marks incorporate the parties' trade names into the text. PCHS additionally asserts the marks are similar because they are in the same "hand-drawn" style. Dkt. 50 at 20.

Both trade names end in "Health Services," but it is noteworthy that the first words are different. PCHS's begins with "Peninsula," while OPHS's begins with "Olympic." The first word in a mark often constitutes the "dominant feature in the commercial impression," and this feature is distinct between the marks. *Clearly Food & Beverage Co., Inc. v. Top Shelf Beverages, Inc.*, 102 F. Supp. 3d 1154, 1170 (W.D. Wash. 2015) (parenthetically quoting *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005)). The trade names are also distinct in that OPHS's name does not use the term "Community." Additionally, OPHS's mark only has two trees, while PCHS's mark has six.

The marks are distinct but have overlapping similarities. Overall, the Court must weigh the similarities more heavily than the differences, which controls the result here. Although OPHS has identified certain differences between the marks, a reasonable factfinder could find that the similarities in how the marks are used in the marketplace and in the sound and meaning outweigh the differences. A reasonable factfinder could find that the marks are similar. This factor weighs in favor of PCHS.

### b.    Strength of the Marks

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws."

1    *GoTo.com, Inc.*, 202 F.3d at 1207 (citing *Kenner Parker Toys Inc. v. Rose Art Indus.,*

2    *Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)). The strength "of the trademark is evaluated in

3    terms of its conceptual strength and commercial strength." *Id.*

4        As discussed above, PCHS's mark is not generic and is likely descriptive, but

5    questions of fact remain as to whether the mark has acquired secondary meaning

6    warranting protection. Although a descriptive mark is "inherently a weak mark, it may be

7    strengthened by such factors as extensive advertising, length of exclusive use, [and]

8    public recognition." *Entrepreneur Media*, 279 F.3d at 1144 (internal quotations and

9    alterations omitted). PCHS has used its trade name since 1999 and its logo since 2001;

10    this length of use strengthens its mark. But, again for the reasons discussed regarding

11    PCHS's declarants' bias and credibility, the evidence supporting public recognition is

12    minimal. PCHS's mark is weak but strengthened slightly by the length of use. This factor

13    is largely neutral but tips slightly in favor of OPHS.

14           **c.**     **Proximity or Relatedness of the Services**

15        Courts additionally "examine the relatedness of the parties' [services] because the

16    more closely related the [services] are, the more likely consumers will be confused by

17    similar marks." *Id.* at 1147. The proximity or relatedness of services is measured by

18    whether the services are: "(1) complementary; (2) sold to the same class of purchasers;

19    and (3) similar in use and function." *Network Automation, Inc. v. Advanced Sys.*

20    *Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011) (internal citation omitted). "The use

21    of similar marks to offer similar [services] accordingly weighs heavily in favor of

22

likelihood of confusion." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999).

OPHS concedes that the parties "both provide health services through various offices on the Olympic Peninsula or Kitsap Peninsula" but argues that the scope of services between the two are different. Dkt. 36 at 21. Both parties could be said to offer "services relating to the [healthcare] industry generally . . . and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1056 (internal inline citations omitted). Yet, while PCHS provides more extensive medical services, OPHS and PCHS both provide some of the same, complementary services: drug rehabilitation. It is arguable that OPHS and PCHS "compete for the patronage of an overlapping audience," *id.*, although the patronage competed for is only a small subset of PCHS's patients and clientele. The Court agrees that the scope and focus of the parties' services are different but have some overlap, making this factor tip slightly in favor of PCHS.

### d. OPHS's Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354 (internal citation omitted). "Good faith is less probative of the likelihood of confusion, yet may be given considerable weight in fashioning a remedy." *Id.* PCHS does not argue that OPHS had a bad faith intent in selecting its mark nor does it provide evidence of bad faith. *See* Dkt. 50 at 23. Failoni declares, and testified in her deposition, that (1) she had never heard of PCHS

1    until its May 2019 demand letter; (2) OPHS came up with adopted the name "OLYMPIC

2    PENINSULA HEALTH SERVICES" without any knowledge of or reference to PCHS;

3    and (3) she performed a reasonable search to ensure that the OPHS mark was available

4    before its adoption. *See* Dkt. 13, ¶¶ 3–8; *see also* Failoni Dep., at 68:19–25, 70:2–16.

5    Absent evidence of OPHS's bad faith in selecting its mark, this factor is neutral.

6                 **e.**      **Evidence of Actual Confusion**

7        "Evidence that use of the two marks has already led to confusion is persuasive

8    proof that future confusion is likely. . . . Proving actual confusion is difficult,

9    however, . . . and the courts have often discounted such evidence because it was unclear

10    or insubstantial." *Sleekcraft*, 599 F.2d at 352 (internal citations omitted). "The failure to

11    prove instances of actual confusion is not dispositive against a trademark plaintiff,

12    because actual confusion is hard to prove; difficulties in gathering evidence of actual

13    confusion make its absence generally unnoteworthy." *Brookfield Commc'ns*, 174 F.3d at

14    1050 (emphasis omitted). "[T]his factor is weighed heavily only when there is evidence

15    of past confusion or, perhaps, when the particular circumstances indicate such evidence

16    should have been available." *Sleekcraft*, 599 F.2d at 353.

17        PCHS provides several declarations to support this factor that OPHS's mark has

18    caused actual confusion among consumers in the marketplace. For example, the Chief

19    Executive Officer for North Olympic Healthcare Network in Port Angeles declares that

20    he and his colleagues were confused about whether OPHS and PCHS were the same

21    entity when OPHS opened. Dkt. 25, ¶ 8. A Clallam County Health Officer declares that

22    there was "some confusion between OPHS and PCHS" but does not clarify who was

1    confused. Dkt. 19, ¶ 5. A Lieutenant with the Kitsap County Sheriff's Office similarly

2    declares that she was confused when hearing OPHS mentioned, Dkt. 26, ¶ 4, as does

3    PCHS's Board of Directors Patient Representative, Dkt. 27, ¶ 6.

4         The issue with this confusion evidence is that it does not support an inference that

5    the buying public would mistake OPHS for PCHS or vice versa. Rather it establishes

6    confusion generally or among other health care professionals. *Accord Echo Drain v.*

7    *Newsted*, 307 F. Supp. 2d 1116, 1126–27 (C.D. Cal. 2003). The only evidence of a

8    patient being confused by the two marks is from a PCHS board member, who generally

9    expresses concerns that other patients will make the same mistake. Dkt. 27, ¶ 3. The

10   evidence of actual consumer confusion is minimal, at best. Because this factor is only

11   weighed heavily when there is evidence of actual confusion, this factor is neutral.

12              **f.    Marketing Channels**

13        "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*,

14   599 F.2d at 353. "In assessing marketing channel convergence, courts consider whether

15   the parties' customer bases overlap and how the parties advertise and market their

16   products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014)

17   (citation omitted).

18        OPHS has two clinic locations: one in Port Angeles in Clallam County and one in

19   Port Hadlock-Irondale in Jefferson County. Dkt. 13, ¶ 9. OPHS asserts that its Port

20   Hadlock clinic typically serves patients from Jefferson County and occasionally patients

21   from Clallam or Kitsap County and that its Port Angeles clinic typically serves patients

22   from Clallam and Jefferson counties. PCHS has twenty-four clinics located in Bremerton,

1    Silverdale, Shelton, Belfair, Kingston, Port Orchard, and Poulsbo. Dkt. 18, ¶ 3. These

2    clinics are located in Kitsap County, Mason County, and Pierce county. *Id.* Both parties

3    market their respective services to the public via signs at their office locations and on

4    their websites. Dkt. 13, ¶¶ 11, 15.

5          OPHS argues that it offers different service specialties from PCHS in a distinct

6    geographic location; OPHS operates on the Olympic Peninsula, while PCHS operates on

7    the Kitsap Peninsula. PCHS asserts that the parties' clinics operate in an overlapping

8    geographic market, providing medical and drug rehabilitation services and serving the

9    residents of Kitsap, Jefferson, and Clallam counties. PCHS further argues that the parties

10   "compete for state grant funding and patient referrals as Hubs in Washington's Hub and

11   Spoke system."[3] Dkt. 50 at 21. OPHS avers that PCHS is the Hub in Kitsap County and

12   has spokes in Jefferson and Clallam County but highlights that the spokes on the Olympic

13   Peninsula do not use PCHS's trademark. Dkt. 30, ¶¶ 4, 5.

14         Like the relatedness of services factor, the marketing channel factor tips slightly in

15   favor of PCHS. The scope and focus of the parties' services overlap but are

16   distinguishable, just like the markets the parties' clinics serve. PCHS's clinics that bear

17   its mark are in a geographically distinct location from OPHS's clinics. But the parties

18   appear to serve patients from the same areas, such as Jefferson County. If this were not

19

20   ───────────────

[3] Washington State facilitates medication assisted treatment using "Hub and Spoke" networks, which were developed to increase medication treatment for opioid use disorder capacity in the state. Dkt. 30, ¶ 2. The network consists of a leading agency, or "hub," that collaborates with "spokes" that either provide treatment or referrals to the hub and spoke agencies for treatment. *Id.*; *see also* Dkt. 30-1, Ex. A.

the case, this factor would weigh in favor of OPHS. Because there is a narrow overlap of

clientele, there is a minimal convergence in marketing channels, so the factor is slightly

in favor of PCHS.

### g.    Possibility of Expansion

"[A] strong possibility that either party may expand his business to compete with

the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599

F.2d at 354 (citation and internal quotation marks omitted). Neither party offers evidence

of likely expansion, though PCHS renews its argument that the two parties are currently

direct competitors. Dkt. 50 at 23. This factor is ultimately neutral.

### h.    Degree of Consumer Care

"In assessing the likelihood of confusion to the public, the standard used by the

courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353

(citation omitted). Although the "wholly indifferent may be excluded," the standard

"includes the ignorant and the credulous." *Id.* (citations omitted). "When the buyer has

expertise in the field, a higher standard is proper though it will not preclude a finding that

confusion is likely . . . . Similarly, when the goods are expensive, the buyer can be

expected to exercise greater care in his purchases; again, though, confusion may still be

likely." *Id.* (citations omitted).

OPHS argues that important healthcare decisions "doubtless trigger a heightened

standard of care in the ordinary consumer." Dkt. 36 at 21 (quoting *UHS of Del., Inc. v.*

*United Health Servs., Inc.*, 227 F. Supp. 3d 381, 395 (M.D. Pa. 2016)).[4] PCHS submits

that it serves non-native speakers and transient patients with substance use disorder who

are at a greater risk of confusing PCHS and OPHS. Dkt. 18, ¶ 14. PCHS provides the

declaration of its CEO in support of this assertion but no other evidence of its client base.

*Id.* The Court agrees with OPHS on this factor. A heightened standard applies to both

PCHS and OPHS's customers because of the nature of the services provided. Further,

there is minimal evidence supporting the assumption that an ordinary patient exercise

little or no care in selecting substance abuse and rehabilitation services or that non-native

speakers or transient patients were actually confused. Such important healthcare

decisions trigger a heightened standard of care. This factor therefore favors OPHS,

although to a limited extent.

### i.       Conclusion

Three of the *Sleekcraft* factors are in favor of OPHS, three are in favor of PCHS,

and two are neutral. The factors are "not a rote checklist," *Network Automation*, 638 F.3d

at 1145, and the analysis is "'pliant,' illustrative rather than exhaustive, and best

understood as simply providing helpful guideposts," *Fortune Dynamic*, 618 F.3d at 1030

(quoting *Brookfield Commc'ns*, 174 F.3d at 1054). But the similarity of the marks "has

always been considered a critical question in the likelihood-of-confusion analysis."

---

[4] The Third Circuit uses the *Lapp* factors to determine whether there is a likelihood of confusion between competing marks. *See Interpeace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). The non-exhaustive list of ten factors used by the Third Circuit includes some different factors from the *Sleekcraft* factors, such as the length of time the defendant has used the mark without evidence of actual confusion arising, but also considers the care expected of consumers when making a purchase. *See id.*

*GoTo.com*, 202 F.3d at 1205. This factor with relatedness of the services and use of common marketing channel, which both tip slightly in favor of PCHS, ultimately controls the Court's analysis here.

In this case, even though consumers and patients are likely to use greater care when selecting a healthcare provider and there is little evidence of consumer confusion, PCHS has provided sufficient evidence to create a question of fact as to whether there is a likelihood of confusion. Because of the similarities, which are weighed heavier than the differences, and the fact that the relatedness of the parties' services and their marketing channels slightly overlap, a reasonable factfinder could conclude that a reasonably prudent consumer would confuse the two marks. This may be a close call, but there is ultimately a question of fact as to whether there is a likelihood of confusion.

OPHS's motion for summary judgment is therefore DENIED as to PCHS's Lanham Act claim.

## C.   Remaining Claims

In addition to its Lanham Act trademark infringement claim, PCHS brings a trade name infringement claim, as well as state law claims for trademark infringement, in violation of RCW Ch. 19.77, and for unfair business practices, in violation of RCW Ch. 19.86, Dkt. 64 at ¶¶ 24–26 (trade name infringement); ¶¶ 27–32 (state law trademark infringement); ¶¶ 33–38 (unfair business practices). OPHS argues that because PCHS's trademark infringement claim under the Lanham Act fails as a matter of law, PCHS's remaining claims should be dismissed. Dkt. 36 at 29. But because the Court has denied

OPHS's motion for summary judgment for the Lanham Act claim, its motion for the remaining claims is similarly DENIED.

### III.  ORDER

Therefore, it is hereby **ORDERED** that Defendants Olympic Peninsula Health Services and Ann and John Doe Failoni's motion for summary judgment, Dkt. 36, is **DENIED**. It is hereby further **ORDERED** that Plaintiff Peninsula Community Health Services' motion for partial summary judgment, Dkt. 39, is **GRANTED in part** and **DENIED in part** and that Peninsula's motion to seal, Dkt. 49, is **GRANTED**.

Dated this 5th day of April, 2022.

_____
BENJAMIN H. SETTLE
United States District Judge