1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| PENINSULA COMMUNITY HEALTH SERVICES, | CASE NO. 3:20-cv-05999-BHS |
| Plaintiff, | DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW |
| v. | |
| OLYMPIC PENINSULA HEALTH SERVICES PS; and ANN FAILONI, | |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

ORDER - i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# DECISION

This case is a trademark dispute between two health services companies who provide substance use treatment services in Washington State. Plaintiff Peninsula Community Health Services ("PCHS") is a non-profit corporation with a principal place of business in Bremerton, Washington. PCHS's eleven clinics are located in Kitsap, Mason, and Pierce counties; most of those clinics are located on the Kitsap Peninsula.[1] Defendant Olympic Peninsula Health Services ("OPHS") is a for-profit corporation with a principal place of business in Chimacum, Washington. OPHS's clinics are located in Clallam and Jefferson counties—locations all considered part of the Olympic Peninsula.[2]

Both PCHS and OPHS are "hubs" in Washington's "Hub and Spoke Project," a program designed to connect community providers ("spokes") around a "hub" that offers medication-assisted treatment ("MAT"). OPHS and PCHS have different spokes and provide services to patients in different geographic areas.

There are several notable differences between PCHS and OPHS, beyond their geographic locations. PCHS is much larger than OPHS and provides more services than just substance use treatment. OPHS, on the other hand, provides only substance use treatment services. PCHS has also been in business for much longer than OPHS; PCHS began operations in 1987 while OPHS began operations in 2018.

The crux of the case is PCHS's claim that OPHS's name and logo infringe on its trademarked name and logo. The competing logos are shown below:

---

[1] The Kitsap Peninsula is bordered on the West by Hood Canal and on the East by the Puget Sound. It includes the entirety of Kitsap County (except Bainbridge and Blake Islands), and parts of Mason and Pierce counties.

[2] The Olympic Peninsula is bordered on the West by the Pacific Ocean and on the East by Hood Canal. It includes the entirety of Clallam and Jefferson counties and the northern parts of Grays Harbor and Mason counties.

 

PCHS sued OPHS[3] in October 2020, alleging Unfair Competition and False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a); Trade Name Infringement; Trademark Infringement under RCW 19.77; and violation of the Unfair Business Practices Act, RCW Ch. 19.86. Dkt. 1, ¶¶ 19–41. PCHS amended its complaint, alleging the same causes of action, on February 8, 2022. *See* Dkt. 64, ¶¶ 19–39. The amended complaint seeks injunctive relief and attorneys' fees, but no damages. *Id.* at 8–9. A bench trial was held before this Court on October 18, 2022.

To show a violation of the Lanham Act, the plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. The parties agree that PCHS owns the marks at issue, although OPHS asserts as an affirmative defense that PCHS did not have priority of use in the relevant area. Because the Court ultimately concludes that there is no infringement, this affirmative defense is inapplicable.

The other three causes of actions rise and fall with the Lanham Act claim. *See Custom Auto Interiors, Inc. v. Custom RV Interiors, Inc.*, 144 Wn. App. 1039, 2008 WL 6693460, at *4 (May 20, 2008) (trade name and trademark infringement under Washington law); *Clean Crawl, Inc. v. Crawl Space Cleaning Pros, Inc.*, No. 17-cv-1340 BHS, 2019 WL 5722221, at *14 (W.D. Wash. Nov. 5, 2019) (Unfair Business Practices Act). Further,

---

[3] PCHS also sued individuals Atif and Jane Doe Mian, and Ann and John Doe Failoni. It voluntarily dismissed as defendants Atif Mian, Jane Doe Mian, and John Doe Failoni. Dkts. 62, 80.

the other three causes of action were not discussed separately at trial and no separate proof was offered on any.[4] Therefore, the Court does not analyze them separately.

To be valid and legally protectable, a mark must be distinctive. There are five categories of trademarks: (1) generic; (2); descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). If a mark is suggestive, arbitrary, or fanciful, it is deemed inherently distinctive and therefore automatically entitled to protection. *Id.* If the mark is merely "descriptive," it must have acquired secondary meaning to be considered distinctive and protectable. *Id.* Courts use two tests to determine whether a mark is descriptive: the "imagination test" and the "competitors' needs" test. *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987), *overruled on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

The imagination test asks whether imagination or a mental leap is required to reach a conclusion as to the nature of the services being referenced. *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007). Dictionary definitions are relevant and persuasive under the imagination test. *See, e.g.*, *id.*; *see also Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1015 n.11 (9th Cir. 1979).

The competitors' needs test looks to "the extent to which a mark is actually needed by competitors to identify their goods or services." *Rodeo Collection*, 812 F.2d at 1218. Widespread use of a word or image in a mark weighs in favor of finding a mark to be descriptive. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142–43 (9th Cir. 2002).

PCHS concedes that its word mark is descriptive but argues that its design mark is suggestive. *See* Dkt. 90 at 4–6. It further argues that its word mark has acquired secondary

---

[4] PCHS does not mention the RCW Ch. 19.86 claim in its post-trial brief, Dkt. 103, or reply, Dkt. 106, or analyze the claim in its proposed findings of fact and conclusions of law, Dkt. 91. It seems to concede in its trial brief that the claim rises and falls with its Lanham Act claim. *See* Dkt. 90 at 20–23.

meaning and is therefore entitled to protection, despite being merely descriptive. *Id.* at 6–9. OPHS argues both PCHS's word and design marks are descriptive and that they have not acquired secondary meaning and are therefore not entitled to protection. Dkt. 88 at 23–40.

Both companies' word marks feature descriptive terms, explaining where they are located and the types of services they provide. While PCHS's word mark uses the term "peninsula" more generally than OPHS's "Olympic Peninsula," it is clear that "peninsula" in PCHS refers to the Kitsap Peninsula—where most of its clinics are located. None of PCHS's clinics are located on the Olympic Peninsula.

Most notable to the Court is the weakness of both companies' marks. They are descriptive in nature, the words contained within the word marks are frequently used by businesses both in and outside of Washington, and the design marks feature design elements that are not particularly unique. It would not be difficult for any resident of the Kitsap or Olympic Peninsulas to identify a local business containing the term "peninsula," even if narrowed to only health care businesses. Similarly, it would not be difficult for any Washington resident to identify a local business with a design mark featuring trees, mountains, or both.

The Court concludes that PCHS's word and design marks are descriptive under both the imagination test and the competitor's needs test. Thus, to be protectable the marks must have acquired secondary meaning.

A mark has acquired secondary meaning if "the purchasing public associates the [mark] with a single producer or source rather than the product itself." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987). Courts consider a variety of secondary meaning factors, including consumer perception, advertisement, demonstrated utility, extent of use, exclusivity, copying, and actual confusion. Ninth Cir. Civil Jury Instr.

15.11 (2022). These factors are non-exclusive and the weight given to each depends on the case at hand. Consumer surveys and other direct evidence is the "most persuasive evidence on secondary meaning." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985). Secondary meaning can also be established using circumstantial evidence of "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

PCHS did not produce any direct evidence of secondary meaning, but rather put forward circumstantial evidence including testimony of two witnesses who are *indirect* consumers of their services. PCHS also proffered evidence of revenues, number of patients, and advertising. None of the evidence showed that PCHS advertised in Clallam or Jefferson County during the relevant time period, treated patients from those counties, or provided services there.

The Court concludes that PCHS's marks have not acquired secondary meaning. Even if PCHS's marks have acquired secondary meaning, however, PCHS did not establish likelihood of confusion.

Similarly, PCHS failed to establish likelihood of confusion. To determine whether there is a likelihood of confusion, courts analyze the eight "*Sleekcraft* factors": (1) strength of the mark; (2) similarity of the marks; (3) proximity or relatedness of services; (4) defendant's intent in selecting the mark; (5) actual confusion; (6) marketing channels used; (7) likelihood of expansion; and (8) degree of consumer care. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by New Kids On The Block v. New America Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992). Likelihood of confusion is viewed in totality; the factors are not "rigidly weighed." *Dreamwerks Prod. Grp., Inc. v.*

*SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). The Court concludes that seven of the eight *Sleekcraft* factors weigh in favor of OPHS and that, viewed in totality, PCHS's marks have not acquired secondary meaning.

As noted, both parties' marks are remarkably weak, evidenced by widespread use of the relevant word and design elements by companies both inside and outside of Washington and by all kinds of companies, including health services companies. PCHS's marks are weak and the first *Sleekcraft* factor weighs in favor of OPHS.

There are some similarities between the parties' trademarks. Both word marks contain the phrase "health services," accurately describing the type of services the companies both provide. Both word marks also contain the term "peninsula," which describes both companies' locations, although notably referring to different peninsulas. Both design marks feature trees and the respective companies' names. The similarities end there, however. The word marks sound different, notably starting with different letters and terms, and look different.

The parties' design marks are even more distinct from each other. PCHS's mark features a grove of six trees on the left side, bordered below by curvy lines, and bordered on the right by its word mark: Peninsula Community Health Services. OPHS's mark features a mountain range framed by a tree on either side, bordered below by its acronym "OPHS," and beneath that its word mark "Olympic Peninsula Health Services." The two marks do not look alike.

The parties' marks are distinct from each other. The second *Sleekcraft* factor thus also weighs in favor of OPHS.

Some PCHS and OPHS clinics are located near each other, but their service areas do not overlap.[5] PCHS and OPHS do provide similar services, however. The third *Sleekcraft* factor thus weighs in favor of PCHS.

OPHS did not intend to copy PCHS's word or design mark; PCHS concedes this point. The fourth *Sleekcraft* factor thus weighs in favor of OPHS.

There is no evidence of actual confusion or converging marketing channels. The fifth and sixth *Sleekcraft* factors thus weigh in favor of OPHS.

There is no persuasive evidence that PCHS has definitive plans to expand into OPHS's market area or that OPHS has plans of expanding into PCHS's market area. The seventh *Sleekcraft* factor thus weighs in favor of OPHS.

Finally, consumers accessing health care services exercise a heightened degree of care. The eighth *Sleekcraft* factor thus weighs in favor of OPHS.

OPHS also asserts that PCHS failed to establish priority of use in Clallam and Jefferson counties and therefore its claim fails on the second prong of the Lanham Act analysis as well. In support of this argument OPHS cites the *Tea Rose-Rectanus* doctrine, which is an affirmative defense providing that a later user may acquire rights to a mark in a geographically remote area so long as the junior user acted in good faith. *Stone Creek, Inc. v. Omni Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017), *abrogated on other grounds by Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020).

Because the Court concludes that there is no infringement, the *Tea Rose-Rectanus* doctrine does not apply.

OPHS seeks attorneys' fees and costs. The Court concludes PCHS did not pursue this claim in bad faith and that its claims were not baseless or unreasonable. As mentioned,

---

[5] PCHS does have "spokes" in Clallam and Jefferson counties through Washington's Hub and Spoke Project. At least some of those clinics provide MAT services, but they do so under their own clinics' names without using PCHS's word or design marks.

the parties' marks have similarities, and they offer similar services. Attorneys' fees are not warranted in this case.

In addition to the forgoing, the Court enters the following more detailed findings of fact and conclusions of law.

## FINDINGS OF FACT

**A.    Parties**

1.    Plaintiff Peninsula Community Health Services ("PCHS") incorporated in Washington on September 11, 1987. On June 1, 1999, PCHS changed its name to Peninsula Community Health Services. PCHS provides medical, dental, behavior health, and pharmacy services in Kitsap, Mason, and Pierce Counties.

2.    Defendant Olympic Peninsula Health Services incorporated in Washington on January 1, 2018. Defendant Ann Failoni is president of Olympic Peninsula Health Services. Both are collectively referred to herein as "OPHS." OPHS provides medical and addiction treatment services in Clallam and Jefferson Counties.

**B.    Parties' Marks**

3.    On June 1, 1999, PCHS began using the PENINSULA COMMUNITY HEALTH SERVICES word mark in connection with its healthcare services in Kitsap County. PCHS began using the PENINSULA COMMUNITY HEALTH SERVICES word mark later in Mason and Pierce Counties as it established clinic locations in those counties. The PCHS word mark was registered in Washington on October 9, 2020 (Reg. No. 1080598).

4.    On July 1, 2000, PCHS began using the logo depicted below to promote its healthcare services in Kitsap County:

 

The PCHS design mark consists of the prominent company name PENINSULA COMMUNITY HEALTH SERVICES vertically oriented, with each word above the next, to the right of an image of a grove of six hand-drawn evergreen trees above a curvy line suggesting the ground from which the trees sprang. Both the words and image are used together in black-and-white and other times in a light green color. PCHS began using the logo later in Mason and Pierce Counties as it established clinic locations in those counties. The PCHS design mark was registered in Washington on February 6, 2018 (Reg. No. 1078155) for a "Stylized image of a cluster of six evergreen trees accompanied by organization name, varying in color depending upon background" for use with "Medical, Veterinary & Hygienic" services.

5.      On January 1, 2018, OPHS began using the name OLYMPIC PENINSULA HEALTH SERVICES and the design mark  around that time in Jefferson and Clallam Counties. The OPHS design mark consists of a prominent image of the Olympic Mountain range, framed by two evergreen trees, shown in either black-and-white or dark green. In or around fall 2018, OPHS updated its design mark as shown below:

The updated OPHS design mark consists of the same a prominent image of the Olympic Mountain range, framed by two evergreen trees, where the trees grow out of the "O" and "S" of a prominent OPHS acronym. The mark is used in black-and-white or color. When shown in color, the Olympic Mountain range, two framing trees, and large OPHS acronym are all shown in dark green, on a largely blue background. The design mark is sometimes shown above the much smaller company name, shown in white, with the words "Olympic Peninsula" above the words "Health Services."

6.    OPHS selected its design mark in part because OPHS clinics were located on the Olympic Peninsula, and in part because of love of the view of the Olympic Peninsula mountains framed by two evergreen trees that are visible from the front window of OPHS's nurse's house in Sequim, using free clip art of a tree and mountain silhouette, as shown.



7.    PCHS's word mark PENINSULA COMMUNITY HEALTH SERVICES includes the term COMMUNITY while OPHS's word mark does not.

8.    The first and second words of PCHS's word mark PENINSULA COMMUNITY HEALTH SERVICES are different from the first and second words of OPHS's word mark OLYMPIC PENINSULA HEALTH SERVICES.

9.    PCHS's design mark includes six trees as a design element.

10.    PCHS's design mark includes a design element that is positioned below six trees.

11.    PCHS's design mark does not include a mountain or a hill as a design element.

12.     OPHS's design mark includes two prominent trees as a design element.

13.     OPHS's design mark includes mountains as a design element.

14.     OPHS's design mark includes the mountains in the background between two trees in the foreground.

## C.     **Parties' Clinics**

15.     PCHS's administrative office is located at 400 Warren Ave, Bremerton, Washington.

16.     PCHS has clinics at the following locations, all in Kitsap, Mason, or Pierce Counties, as shown.



- 5455 Almira Drive NE, Bremerton, WA 98311

- 31 WA-300, Belfair, WA 98528

- 627 W. Franklin Street, Shelton, WA 98584

- 11901 137th Avenue Ct. N.W., Suite A, Gig Harbor, A 98329

- 25989 Barber Cut Off Rd NE, Kingston, WA 98346

- 1950 Pottery Avenue Suite 170, Port Orchard, WA 98366

- 320 S Kitsap Blvd., Port Orchard, WA 98366

- 19917 7th Ave NE #205, Poulsbo, WA 98370

- 3100 Northwest Bucklin Hill Road, Suite 202, Silverdale, WA 98383

- 616 6th Street, Bremerton, WA 98337

- 2508 Wheaton Way, Bremerton, WA 98310

17.     PCHS has never had clinics in Clallam or Jefferson Counties.

18.     All of PCHS's clinics are located on the *Kitsap* Peninsula in Kitsap County as well as in Pierce and Mason Counties,[6] Washington State.

19.     OPHS has clinics located at 661 Ness' Corner Rd, Port Hadlock-Irondale, and 1605 E Front Street, Suite C, Port Angeles, Washington, both in either Clallam or Jefferson Counties which are located on the *Olympic* Peninsula, as shown.



20.     OPHS has never had clinics in Kitsap, Mason, or Pierce Counties.

## D.     Validity of PCHS Marks

21.     PCHS admits that the PENINSULA COMMUNITY HEALTH SERVICES mark is merely descriptive. PCHS asserts that its design mark is suggestive.

### 1.     *Suggestive versus Descriptive*

#### a.     **Imagination test**

22.     The word portion of PCHS's design mark is identical to the descriptive word mark PENINSULA COMMUNITY HEALTH SERVICES.

23.     The term PENINSULA has a common dictionary definition: "[A] portion of land nearly surrounded by water and connected with a larger body by an isthmus."[7]

24.     The term PENINSULA, as used in the PCHS marks, describes the geographical peninsulas in Western Washington on the *Kitsap* Peninsula, where PCHS is headquartered and where most of its clinics are located (except the ones located in Pierce County and Shelton, Washington—neither of which are located on either Kitsap or

---

[6] Arguably PCHS's Belfair clinic in Mason County could be considered to be on the Kitsap Peninsula.
[7] *Peninsula*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/peninsula (last visited Feb. 24, 2023).

Olympic Peninsulas). OPHS's two clinics are in Jefferson and Clallam Counties which are on the Olympic Peninsula.

25.    The term COMMUNITY has a common dictionary definition: "the people living in a particular area."[8]

26.    The term COMMUNITY in conjunction with the term PENINSULA, or PENINSULA COMMUNITY, as used in the PCHS mark, describes the communities on the Kitsap Peninsula to which PCHS provides its services.

27.    The term HEALTH SERVICES has a common dictionary definition: "a service that provides medical treatment and care to the public or a particular group."[9]

28.    The term HEALTH SERVICES as used in the PCHS marks describes the type of services provides by PCHS.

29.    The word portion of PCHS's design mark is large, displayed prominently, and, as the only verbal element, is the dominant part of PCHS's design mark.

30.    Washington State, nicknamed the Evergreen State, has large evergreen coniferous forests.

31.    Images of evergreen trees are typically colored green to describe the usual color of evergreen trees in Western Washington.

**b.    Competitor's needs test**

32.    More than 350 active Washington businesses use the term PENINSULA in their name or mark.

33.    More than 2,900 active Washington businesses use the term COMMUNITY in their name or mark.

---

[8] *Community*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/community (last visited Feb. 24, 2023).
[9] *Health Service*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/health-service (last visited Feb. 24, 2023).

34. More than 300 active Washington businesses use the term HEALTH SERVICES in their name or mark.

35. More than 70 active Washington businesses use the term OLYMPIC PENINSULA in their name or mark.

36. More than 40 active Washington businesses use the term PENINSULA and either COMMUNITY, HEALTH, SERVICE, or HEALTH SERVICE in their name or mark.

37. More than 30 Western Washington businesses provide community health services that incorporate PENINSULA and frequently HEALTH or SERVICES in their name or mark.

38. The identical term PENINSULA COMMUNITY HEALTH SERVICES has been used by an unrelated health services organization on the Alaska Peninsula for the last 13 years.

39. Olympic Peninsula Community Clinic has been using its name to provide health services in Clallam County for five years. It has a clinic less than one mile, about a two-minute drive from OPHS's Port Angeles clinic. The name of this entity is in some ways similar to the names of both parties which reflects on the weakness of the marks of both parties.

40. Peninsula Behavioral Health has been using its name to provide health services in Clallam County since at least April 2012, when it obtained its Washington Trademark (Reg. No. 55200). It has a clinic that also provides MAT services about two miles, or about a seven-minute drive, from OPHS's Port Angeles clinic. This entity's name is also somewhat similar to both parties' names which further reflects the weakness of both parties' marks.

41.     Both Olympic Peninsula Community Clinic and Olympic Community Behavioral Health have names that are somewhat similar to the names of both parties which is further evidence reflecting the weakness of both parties' marks.

42.     Competitors use the terms PENINSULA, COMMUNITY, and HEALTH SERVICES and tree images in trade names and marks describing the type of services provided and the location of those services.

### 2. *Secondary Meaning*

43.     **Consumer Perception**. PCHS introduced no direct evidence (consumer surveys or expert or consumer testimony) of what consumer perception of its marks was as of January 1, 2018, in Clallam and Jefferson Counties.

44.     PCHS introduced no circumstantial evidence of what consumer perception of its marks was as of January 1, 2018, in Clallam and Jefferson Counties. Rather, the only circumstantial evidence of consumer perception of its marks as of January 1, 2018, related to evidence of public use of the marks with consumers near PCHS clinics in Kitsap, Mason, and Pierce Counties.

45.     **Advertisement**. PCHS introduced some evidence of advertising and promotional efforts to develop its marks but provided no documents supporting the amount, if any, that it spent on sales, advertising, and promotional activities prior to January 1, 2018. PCHS submitted evidence of sporadic use of flyers or brochures, or periodic advertisements or newspaper references, but failed to provide any detailed evidence as to the number distributed, how they were distributed, or who received them and where. PCHS introduced evidence on overall revenues, patients, and visits, but failed to provide specific or detailed evidence proving that this was significantly indicative of success related to PCHS marks, as opposed to attributed to other factors.

46.   **Demonstrated Utility**. PCHS introduced no persuasive evidence proving that its use of the PCHS marks increased the provision of its services.

47.   **Extent of Use**. PCHS used or displayed its marks for 18 years prior to OPHS use, but only in Kitsap, Mason, and Pierce Counties, and only in a *de minimus* way in the relevant areas of Clallam and Jefferson Counties.

48.   **Exclusivity**. There are hundreds of examples of third-party uses of the common terms PENINSULA, COMMUNITY, and HEALTH SERVICES, as well as images of evergreen trees, in business names and marks in Washington. PCHS's use of such terms and features is not exclusive.

49.   **Copying**. PCHS admits that OPHS did not copy PCHS's marks or select its marks with any intent to deceive the public as to the source or sponsorship of its services. To the contrary, (1) Ms. Failoni had never heard of PCHS until its May 2019 demand letter; (2) PCHS came up with and adopted the OLYMPIC PENINSULA HEALTH SERVICES name without any knowledge of or reference to Peninsula; (3) Ms. Failoni performed a reasonable search to ensure that the OPHS mark was available before its adoption; and (4) OPHS independently selected the graphic design portion of the mark based on local geographical references and from free clip art.

50.   **Actual Confusion**. Despite nearly five years of coextensive use of the parties' respective marks, PCHS failed to introduce any evidence of actual consumer confusion. PCHS did produce marginal evidence of trademark confusion of two of its witnesses: Dr. Michael Maxwell of Peninsula Behavioral Health Services in Port Angeles, a referring agency, and Chief Penelope Sapp of the Kitsap County Jail. These two witnesses might be considered "customers" and not technically "consumers," who, in the relevant industry would be patients. They also have had a contractual relationship with PCHS and are biased witnesses.

**E.**    **Likelihood of Confusion**

*1.*    *Strength of Mark*

51.    PCHS has admitted that its word mark is merely descriptive.

a.    **Conceptual strength**

52.    The word portion of the PCHS design mark is identical to the descriptive word mark PENINSULA COMMUNITY HEALTH SERVICES. Each of the terms has a common dictionary definition and the mark immediately describes the service provided and location of services.

53.    The word portion of PCHS's design mark—PENINSULA COMMUNITY HEALTH SERVICES—is large, displayed prominently, and, as the only verbal element, is the dominant part of the PCHS design mark.

54.    Evergreen coniferous trees are native to the Kitsap and Olympic Peninsulas of Western Washington, Washington was nicknamed "The Evergreen State" for its evergreen forests, and images of evergreen trees are typically colored green.

b.    **Commercial strength**

55.    PCHS did not introduce evidence of consumer confusion other than, arguably, through the testimony of Dr. Maxwell and Chief Sapp who PCHS argued were "consumers," though they each actually represent entities that contract with PCHS for services and not patient consumers. Otherwise, there was no direct or circumstantial evidence through consumer testimony, consumer surveys, or expert testimony.

56.    PCHS introduced circumstantial evidence of consumer perception of its marks in the form of public use of the marks with consumers near PCHS clinics in Kitsap, Mason, and Pierce Counties. PCHS did not introduce significant and meaningful evidence (1) of advertising and promotional efforts to develop its marks, including any documentary support for the amount, if any, that it has spent on sales, advertising, and promotional

activities over the last twenty years in promoting its brand outside Kitsap and Mason Counties; (2) that its use of the PCHS mark has increased provision of its services; (3) of exclusivity of use of the mark, given the admitted extensive third-party use of all components of its marks; (4) of knowledge, copying, or any bad faith by OPHS in the adoption of its marks (in fact, PCHS conceded that OPHS did not copy the PCHS marks); or (5) evidence of actual patient consumer confusion, despite nearly five years of coextensive use of the parties' respective marks.

**2.    *Similarity of Marks***

57.    The parties' word marks are as follows:

**PENINSULA COMMUNITY HEALTH SERVICES**

vs

**OLYMPIC PENINSULA HEALTH SERVICES**

58.    The immediate consumer perception is that the first dominant term of each mark is completely different: PENINSULA versus OLYMPIC. The next consumer perception is that the first two terms of the marks not only are made up of different words, but words which immediately suggest different things: a group of people as part of a peninsula community versus a well-known geographic region in Western Washington, the Olympic Peninsula community. While both word marks end with HEALTH SERVICES, to the extent it is noticed at all, that part of the marks is immediately understood to be a generic term indicating that both entities provide "health services," and is given little weight as a point of similarity between the marks.

59.    The parties' design marks are as follows:

 

vs

60.    In addition to the same textual differences in the name portions, the immediate consumer perception of the PCHS mark is of the large, prominent, vertically oriented words PENINSULA COMMUNITY HEALTH SERVICES to the right of a grove of six trees (either in black-and-white or light green). In contrast, the immediate consumer perception of the OPHS mark is a large, dark green OPHS acronym with two trees growing out of the "O" and "S" on a mostly blue background, framing the Olympic Mountain range. OLYMPIC PENINSULA HEALTH SERVICES is in small, white text horizontally at the bottom of the design, and is secondarily noticed. The text, images, and colors of the PCHS and OPHS marks are all different.

61.    There is little, if any, overall similarity in the commercial impression between either the word or design marks.

62.    **Sight**. The dominant first word of the PCHS word mark is PENINSULA, which is different than the dominant first word OLYMPIC in the OPHS word mark. The dominant term OLYMPIC in the OPHS mark is not found anywhere in the PCHS mark.

63.    The word marks have different second terms: COMMUNITY versus PENINSULA. The term COMMUNITY in the PCHS mark is not found anywhere in the OPHS mark.

64.    The eye is drawn to the combined terms PENINSULA COMMUNITY in the PCHS mark and OLYMPIC PENINSULA in the OPHS mark, while the concluding term

HEALTH SERVICES is overlooked as it is immediately understood to be a generic term indicating that both entities provide "health services."

65.    In terms of the design marks, these same textual differences are equally present, but further differentiated by the obvious and significant design differences.

66.    With the PCHS mark, the eye is immediately drawn to the large, prominent words PENINSULA COMMUNITY HEALTH SERVICES, while the grove of six trees on the left are viewed in context as a graphical



reinforcement that the services are provided on a peninsula in Western Washington—the well-known home of Washington evergreen trees.

67.    The OPHS mark is a dark green, large OPHS acronym with two trees growing out of the "O" and "S" letters of the acronym, all on a mostly blue background, and framing the Olympic Mountain range. The white text of the name horizontally below is hardly noticed as it is much smaller than the dominant OPHS acronym and framed mountain image.



68.    Both design marks include tree images. The PCHS design mark features a grove of six trees above a curvy ground line, in what appears to be a hand-drawn style. The OPHS framed mountain range image appears to be clearly clip art, and is connected to the dominant textual OPHS acronym, and with much heavier framing trees. The PCHS design mark does not feature a mountain element, large acronym, or trees growing out of textual elements. If color is used with the PCHS mark, it is a light green that is different from the dark green used in the OPHS design mark. The textual element of the PCHS mark is either black or light green, while the textual element for the OPHS mark is white. The text in the OPHS mark is horizontally presented, which focuses the eye even more on OLYMPIC

PENINSULA different from HEALTH SERVICES. While they include certain similarities, the marks are visually different.

69.     **Sound**. The two trademarks sound different. PENINSULA COMMUNITY has eight syllables compared to seven syllables in OLYMPIC PENINSULA. The marks start with different "P" versus "O." The dominant terms PENINSULA COMMUNITY and OLYMPIC PENINSULA sound different.

70.     The same verbal differences are present with the design marks. The prominent OPHS acronym changes the sound, as the public would verbalize the two design marks differently, including adding four distinct new syllables, as follows:

**"Peninsula Community Health Services"**

vs

**"OPHS"**

(or if they notice the smaller company name)

**"OPHS—Olympic Peninsula Health Services"**

71.     **Meaning**. Both the verbal and image elements of the respective marks have different meanings. The dominant PENINSULA COMMUNITY part of the PCHS mark refers to the *Kitsap* Peninsula community of patients serviced by PCHS. The dominant OLYMPIC PENINSULA part of the OPHS mark refers to the *Olympic* Peninsula area serviced by OPHS. The respective marks identify the different geographic areas in which their services are provided. The common HEALTH SERVICES term generically describes the services provided.

72.     The only similarity between the marks are (1) the geographically descriptive term PENINSULA, which appears as the first word in PCHS's mark and as the second word in OPHS's mark; (2) the generic term HEALTH SERVICES, describing that both

parties provide health services; and (3) use of different images of the Washington State evergreen tree.

73.     The only similarities between the marks are common terms that are descriptive and subject to extensive third-party use.

74.     The differences between the marks are of distinctive terms and outweigh the similarities based on the common, merely descriptive terms.

### 3.     Proximity or Relatedness of Services

75.     PCHS provides medical, dental, behavioral health, substance use treatment, and pharmacy services in Kitsap, Mason, and Pierce counties, almost exclusively on the Kitsap Peninsula through 11 clinics located in Bremerton, Kingston, Port Orchard, Gig Harbor, Poulsbo and Silverdale, as well as one each in Belfair and Shelton which are not located on either peninsula.

76.     OPHS provides medical and substance use treatment services exclusively on the Olympic Peninsula through clinics located in Port Angeles in Clallam County and Port Hadlock-Irondale in Jefferson County.

### 4.     Intent in Selecting the Mark

77.     PCHS admits that OPHS did not copy PCHS's marks or adopt the OPHS marks with any intent to deceive the public as to the source of sponsorship of its services.

78.     First, Ms. Failoni had never heard of PCHS until its May 2019 demand letter; Secondly, OPHS came up with and adopted the OLYMPIC PENINSULA HEALTH SERVICES name without any knowledge of or reference to PCHS; Third, Ms. Failoni performed a reasonable



search to ensure that the OPHS marks were available before their adoption; and Fourth OPHS independently selected the design mark because OPHS health services clinics were located on the Olympic Peninsula, and in part because of the view of the Olympic Peninsula mountains framed by two evergreen trees from the front window of OPHS's nurse's house in Sequim, using free clip art of a tree and mountain silhouette.

### 5.   *Actual Confusion*

79.     PCHS did not provide any direct evidence of actual *patient* consumer confusion.

80.     The parties have coexisted as hubs with referring independent spoke businesses operating under different names and marks in the same geographic areas for nearly five years under the Washington Hub and Spokes Project. There was no evidence presented of actual confusion from a patient at any referring spoke during that time.

81.     Given the length of time, number of patients seen, and visits documented over the last five years, some evidence of actual confusion should have become available if OPHS's coexisting use created a genuine likelihood of confusion.

### 6.   *Marketing Channels Used*

82.     Both parties generally provide health services, but they do so for different service specialties primarily from their respective clinics located in remote geographic locations. PCHS provides its services to patients living near its 11 clinics on the Kitsap Peninsula in Kitsap County, as well as Mason and Pierce Counties. OPHS provides its services to patients living near its two clinics on the Olympic Peninsula—in Port Angeles in Clallam County and in Port Hadlock-Irondale in Jefferson County.

83.     The parties' customer bases do not in any significant numbers overlap. The evidence established that (a) patients for OPHS services almost universally live nearby the clinics and do not in any meaningful number travel the 25 miles or more that would be

required to reach PCHS clinics outside the county; (b) OPHS does not market to or see patients in Kitsap, Mason, or Pierce Counties; (c) PCHS failed to show that it in any significant manner markets to patients in Clallam or Jefferson Counties; and (d) PCHS failed to identify any specific OPHS patients in Clallam or Jefferson Counties that it has served in its Kitsap, Mason, or Pierce Counties clinics.

84.     In its nearly five years' existence, OPHS has provided healthcare services to (a) three patients that started with OPHS while living near its Jefferson County clinic and moved to Kitsap County for cheaper housing but continued with OPHS to maintain continuity of treatment; (b) two patients that lived in Kitsap County but came to OPHS's Jefferson County clinic for personal reasons, because of a specific relationship with OPHS or its personnel; and (c) zero patients from Mason or Pierce Counties. Over five years this is a total of five out of 1,554 patients, 0.3% of the patients served by OPHS. This is a *de minimis* number. In addition, there is no evidence that any of these five exceptions were ever or would ever be PCHS patients. There is no overlap of clientele—OPHS does not market to or serve patients in the same areas as PCHS.

85.     PCHS has partner organizations based in Clallam and Jefferson counties on the Olympic Peninsula through its participation in the Washington Hub and Spokes Project.

86.     The parties do not compete for the same state grant funding because (1) their respective grant funding came at different times and from different "buckets"; (2) OPHS obtained grant funding that PCHS was not eligible for because only "local providers," or organizations with clinics in the relevant areas (for OPHS, Clallam and Jefferson Counties, where PCHS admits it has no clinics) were eligible; and (3) as has been demonstrated the past nearly five years, both parties have received state grant funding and have been able to serve their patients and any referrals. There is no evidence that the parties' respective trade

names and marks have or will have any impact on how Washington State awards its funding.

87.     PCHS already had its spokes in place before OPHS obtained the grant and became a hub in 2018. The point of the network is to secure as many organizations as possible to help more people in more areas, and OPHS only approached entities that it believed were not already part of existing networks, and only engaged entities that were not already spokes for a different hub.

88.     Essentially, neither OPHS nor PCHS compete for the same patients. Patients are referred only when they can be serviced by OPHS and are in or moving into OPHS's service area—which is different from that of PCHS. Also, patients for OPHS services almost universally live near the clinics and do not travel the 25 miles or more that would be required to reach PCHS clinics outside the county, and vice versa. OPHS's clinics are remotely located from any of PCHS's clinics, many miles away and in different counties. Both parties focus on different consumers and provide mostly different services to different areas of the state. There is no shortage of patients, and both parties have been able to maintain patient requirements within grant parameters.

### 7.  *Likelihood of Expansion*

89.     OPHS has no clearly defined plan to expand beyond Clallam and Jefferson Counties.

90.     PCHS did not produce evidence of a substantial likelihood that it will expand into Clallam or Jefferson Counties in the foreseeable future.

### 8.  *Degree of Consumer Care*

91.     A relatively high degree of consumer care applies to both PCHS's and OPHS's patients because important healthcare decisions trigger a heightened standard of care. OPHS's patients are not easily confused regarding the provider of their medical

services. OPHS patients would not likely travel more than 25 miles, fighting traffic and crossing over the restrictive Hood Canal Bridge to another peninsula, county, or town to arrive at the wrong clinic.

**F.     Willfulness**

92.     PCHS provided no evidence that OPHS has at any time acted to willfully adopt or infringe PCHS's marks or acted in bad faith in this litigation.

## II.     CONCLUSIONS OF LAW

**A.     Jurisdiction**

1.     Federal jurisdiction exists pursuant to 28 U.S.C. § 1338 in that this is an action for unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a), trade name infringement, infringement of PCHS's registered trademark in violation of RCW 19.77, and violation of Washington's Consumer Protection/Unfair Business Practices Act, RCW 19.86.

**B.     Test for Trademark Infringement and Unfair Competition**

2.     To establish trademark infringement, PCHS has the burden to prove each of the following elements by a preponderance of the evidence: (1) a valid, protectable trademark; (2) PCHS owns the trademark; and (3) OPHS used the mark without consent in a manner that is likely to cause confusion among consumers, whether patients or contractors, as to the source, sponsorship, affiliation, or approval of the goods. Ninth Cir. Civil Jury Instr. 15.6 (2022); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); *ILC Trademark Corp. v. Aviator Nation, Inc.*, 2020 WL 6886436, at *7 (C.D. Cal. Nov. 24, 2020).

3.     As to its Lanham Act false designation of origin and unfair competition, PCHS asserts that OPHS knowingly and willfully created an affiliation or connection between OPHS and PCHS to confuse and mislead the public as to the source of the parties'

competing products. The elements of this claim are identical to that of trademark infringement, with the exception that PCHS's marks need not be registered. *See* 15 U.S.C. § 1125(a); *New West Corp. v. Nym Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979); *Intel Corp. v. Ams. News Intel Publ'g, LLC*, 2010 WL 2740063, at \*2 (N.D. Cal. July 12, 2010).

4.      Under RCW 19.77.930, Washington trademark law must be interpreted consistent with the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and courts evaluate state trademarks and trade names under the same standards of protectability. *Custom Auto Interiors*, 2008 WL 6693460, at \*4 (citing *Seattle Endeavors v. Mastro*, 123 Wn. 2d 339, 344 (1994)).

## C.   <u>Validity of PCHS Marks</u>

5.      To be valid and protectable, a mark must be "distinctive." Distinctiveness measures "the primary significance of the mark to the purchasing public." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir. 2006) (internal quotation marks omitted). In determining distinctiveness, courts consider standards prevalent among prospective purchasers of the services. *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970). The factfinder is not the designated representative of the purchasing public, and the fact-finder's own perception of the mark is not the object of the inquiry. Rather, the factfinder's function is to determine, based on the evidence before it, what the perception of the purchasing public is. *Zobmondo Ent., Ltd. Liab. Co. v. Falls Media, Ltd. Liab. Co.*, 602 F.3d 1108, 1113 (9th Cir. 2010). PCHS bears the burden of proof to show that its trademarks are valid and protectable. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927–28 (9th Cir. 2005).

6.      When a mark is not registered, there is no presumption of trademark validity. *Id.* at 928.

7.      While PCHS has asserted Washington State trademark registrations, these likewise fail to provide any presumption of validity. The presumption of validity that attends trademark registration—including as to secondary meaning for a descriptive mark—begins only as of the date of registration and confers no presumption before the date of registration. *See Converse, Inc. v. Int'l Trade Comm'n Sketchers U.S.A., Inc.*, 909 F.3d 1110, 1117–18 (Fed. Cir. 2018).

8.      Thus, with respect to alleged infringement by OPHS, whose use began prior to either PCHS state registration, PCHS must establish validity, including secondary meaning, without the benefit of any presumption that its marks acquired secondary meaning in the areas of OPHS adoption and use and before OPHS began use of its marks.

### *1.      The PCHS Marks are Merely Descriptive*

9.      There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *KP Permanent Make-Up*, 408 F.3d at 602. "The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally 'serve[] to identify a particular source of a product . . . .'" *Id*. (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). By contrast, a merely descriptive mark describes the qualities or characteristics of a service in a straightforward way that requires no exercise of the imagination to be understood. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005). Courts use two tests to determine distinctiveness: the imagination test and the competitor's needs test.

### a.      Imagination test

10.     The "imagination" test asks whether imagination or a mental leap is required to reach a conclusion as to the nature of the services being referenced. *Rudolph Int'l*, 482 F.3d at 1198. The imagination test is the "primary criterion" for evaluating distinctiveness.

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995).

11.     Under the imagination test, while not determinative, "dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public . . . ." *Surgicenters of Am.*, 601 F.2d at 1015 n.11; *see also* Ninth Circuit Civil Jury Instr. 15.10 (2022). Dictionary evidence is a starting place to draw the line between a suggestive and a descriptive mark. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010).

12.     Under the imagination test, an "entirely unimaginative, literal-minded person" would immediately understand the meaning of the combined term PENINSULA COMMUNITY HEALTH SERVICES, both with and without the geographically descriptive evergreen tree images, as describing the type and location of services—community health services provided on the Kitsap Peninsula.

### b.     Competitor's needs test

13.     The second test, known as the "competitors' needs" test, focuses on "the extent to which a mark is actually needed by competitors to identify their goods or services." *Rodeo Collection*, 812 F.2d at 1218. If competitors have a great need to use a mark, the mark is probably descriptive; on the other hand, if "the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods or services[,] this tends to indicate that the mark is merely suggestive." *Id.* (internal quotation omitted). The competitors' needs test is related to the imagination test, "because the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." *Id.* (internal quotation and alterations omitted).

14.     Widespread use of a word or image by others serves as confirmation of the need to use that word by competitors and militates in favor of finding a mark merely descriptive. *Entrepreneur*, 279 F.3d at 1143–44.

15.     Under the competitor's needs test, given competitors' demonstrated need to use the generic or descriptive terms PENINSULA, COMMUNITY, and HEALTH SERVICES in trade names and tree images in trademarks, both the PCHS word and design marks are descriptive.

16.     When assessing distinctiveness, courts analyze the components of a mark to determine whether those parts, taken together, describe the goods or services offered. *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1201 (9th Cir. 2009).

17.     The terms PENINSULA, COMMUNITY, HEALTH SERVICES and tree images are merely descriptive under both the imagination and competitor's needs tests. Each of these terms have common dictionary definitions and refer to services provided, and in the case of the grove of trees depicted in PCHS's design mark, images of evergreen trees describe where the services are provided. Further, the components are so foundational to describing the services that competitors must be able to use them to describe similar services.

18.     The addition of a grove of evergreen trees above a curvy line does not transform the design mark from descriptive to suggestive. First, images of evergreen trees immediately describe the location where the services are provided. Thus, each component of the design mark—the admittedly descriptive words PENINSULA COMMUNITY HEALTH SERVICES and the images of evergreen trees—retains its descriptive significance, resulting in a combination which is itself descriptive.

19.     Second, the composite term PENINSULA COMMUNITY HEALTH SERVICES and the design mark adding the grove of trees, when considered as a whole,

"immediately conveys information about [the services'] nature," *Lahoti*, 586 F.3d at 1201 (internal quotation omitted), and does not evoke a new and unique commercial impression. This is especially true given that the verbal portion of a word and design mark—in this case the admittedly descriptive term PENINSULA COMMUNITY HEALTH SERVICES—is the dominant portion.

20.   Because the PCHS design mark "describes the qualities or characteristics of a good or service," which is the hallmark of a merely descriptive mark, *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985), it is merely descriptive.

### *2.   Secondary Meaning*

21.   To be protectable, a distinctive mark must have acquired secondary meaning. While not generic, PCHS's marks remain "perilously close to the 'generic' line." *Computerland Corp. v. Microland Computer Corp.*, 586 F. Supp. 22, 25 (N.D. Cal. 1984). Such weak descriptive marks require a strong showing of secondary meaning. *Filipino Yellow Pages*, 198 F.3d at 1151.

### a.   Legal standard for assessing secondary meaning

22.   To establish secondary meaning, PCHS must show that a substantial segment of the purchasing public "associates the [mark] with a single producer or source rather than the product itself." *First Brands*, 809 F.2d at 1383. In analyzing secondary meaning, the trier of fact must consider the following non-exclusive factors:

(1)   **Consumer Perception**. Whether the people who purchase the product that bears the claimed trademark associate the trademark with the owner;

(2)   **Advertisement**. To what degree and in what manner the owner may have advertised under the claimed trademark;

(3)   **Demonstrated Utility**. Whether the owner successfully used this trademark to increase the sales of its product;

(4) **Extent of Use**. The length of time and manner in which the owner used the claimed trademark. However, the mere fact that the plaintiff is using the mark, or that the plaintiff began using it before the defendant, does not mean that the trademark has acquired secondary meaning. There is no particular length of time that a trademark must be used before it acquires a secondary meaning.

(5) **Exclusivity**. Whether the owner's use of the claimed trademark was exclusive;

(6) **Copying**. Whether the defendant intentionally copied the owner's trademark; and;

(7) **Actual Confusion**. Whether the defendant's use of the plaintiff's trademark has led to actual confusion among a significant number of consumers.

Ninth Cir. Civil Jury Instr. 15.11 (2022); *see also Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009).

23.     Secondary meaning can be established through direct evidence such as consumer surveys, which can provide "the most persuasive evidence on secondary meaning," *Levi Strauss*, 778 F.2d at 1358, or consumer testimony. Alternatively, secondary meaning can be established circumstantially through admissible evidence of "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages*, 198 F.3d at 1151. "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Chrysler Corp. v. Vanzant*, 44 F. Supp. 2d 1062, 1074 (C.D. Cal. 1999) (parenthetically quoting *Coach Leatherware Co., Inc. v. Ann Taylor, Inc.*, 933 F.2d 162, 169 (2d. Cir. 1991)).

24.     The relevant time period to determine secondary meaning is the date of the allegedly infringing party's first use. *Levi Strauss*, 778 F.2d at 1358; *Network Automation, Inc. v. Hewlett-Packard Co.*, 2009 WL 5908719, at *6 (C.D. Cal. Sep. 14, 2009).

25.     The relevant geographic area in which secondary meaning must be established is the area in which OPHS operates it clinics. *beef & brew, inc. v. Beef & Brew, Inc.*, 389 F. Supp. 179, 184–85 (D. Or. 1974). OPHS started using its marks in January 2018 and the relevant geographic area is Clallam and Jefferson Counties.

**b.     PCHS lacks direct or relevant evidence of secondary meaning.**

26.     **Consumer Perception**. PCHS's proffered consumer testimony possesses limited, if any, probative value. The "vague, uncorroborated, and clearly self-interested testimony" of PCHS witnesses do not constitute credible, reliable, or relevant evidence for trial as to whether PCHS's marks have acquired secondary meaning.

27.     PCHS evidence in support of secondary meaning is not relevant to show secondary meaning prior to January 2018 in Clallam and Jefferson Counties and is insufficient to meet the heightened burden needed to show secondary meaning of highly descriptive marks.

28.     **Advertisement**. Such evidence would only be relevant if it involved "image advertising" pertaining to the mark; a large expenditure of money does not in itself create legally protectable rights. Rather, the test of secondary meaning is the effectiveness of the effort to create it. *First Brands*, 809 F.2d at 1383. PCHS offered no such evidence.

29.     Sporadic flyers or brochures, or periodic advertisements or newspaper references, with no evidence as to the number distributed, how they were distributed, or who received them, fails to support secondary meaning. *Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1001–02 (S.D. Cal. 2000).

30.     PCHS evidence on revenues and patients is not indicative of secondary meaning because it can be attributed to many other factors. *Id*. at 1003. In addition, such information coming after OPHS began use of the mark is irrelevant because (1) "post-infringement activities have no legal relevance" to whether a mark obtained secondary

meaning prior to accused infringing use, *id.*; and (2) there is no evidence that any of it was directed to the relevant public in Clallam and Jefferson Counties.

31.   **Extent of Use**. "There is no talismanic number of months or years that establishes when an unregistered trademark . . . can obtain secondary meaning. Length of time is merely one additional piece of evidence to be weighed with all others in determining the existence of secondary meaning." *Cont'l Lab.*, 114 F. Supp. 2d at 1004–05 (internal quotation omitted). Rather, "a party's time and exclusivity of use merely provide the opportunity to build source identification in the public mind." *Id.* (internal quotation omitted). A lack of evidence supporting the other factors relevant to secondary meaning diminish the probative value of even a long period of exclusive use. *Id.* The absence of any admissible, credible, and significant evidence that PCHS's marks were used over the preceding 18 years to create an association of its services with its marks in Clallam and Jefferson Counties confirms that there is no secondary meaning.

32.   **Exclusivity of Use**. Evidence of third-party use of marks comprised of terms found in the asserted mark, particularly for the same or similar services, demonstrates the weakness of the mark as a source identifier. *Entrepreneur*, 279 F.3d at 1143–44. PCHS's use of the terms and features of its marks is not exclusive.

33.   **Copying**. PCHS admits that OPHS did not copy PCHS's marks or select its marks with any intent to deceive the public as to the source or sponsorship of its services, and the evidence demonstrates OPHS's good faith.

34.   **Actual Confusion**. While a showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion, non-existent or "*de minimis* evidence of actual confusion" is not "persuasive evidence of actual confusion." *Globefill Inc. v. Elements Spirits, Inc.*, 2016 WL 8944644, at *5 (C.D. Cal. Sep. 20, 2016) (quoting *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir.

1993)). Moreover, the absence of actual confusion between two parties that have used their respective marks for years weighs strongly against likelihood of confusion. *Cohn v. Petsmart*, 281 F.3d 837, 842–43 (9th Cir. 2002). Here, despite nearly five years of coextensive use of the parties' respective marks, there is no probative evidence of actual patient consumer confusion.

35.     PCHS failed to meet its burden of the required "strong showing of strong secondary meaning" for its weak, descriptive marks in Clallam and Jefferson Counties prior to January 1, 2018. *Filipino Yellow Pages*, 198 F.3d at 1151. While failure by PCHS to meet its burden means that its marks are not protectable and ends the case as to all claims without the need for evaluation of ownership or likelihood of confusion, the Court proceeds to these evaluations to confirm its judgment.

**D.     Ownership of PCHS Marks**

36.     "It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works, Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). Federal or state trademark registration provides a presumption of ownership for the territory covered by the registration only as of the registration date of the application for registration. *See Rolley, Inc. v. Younghusband*, 204 F.2d 209, 211 (9th Cir. 1953).

37.     Under the well-established *Tea Rose-Rectanus* doctrine, common-law trademark rights extend only to the territory where a mark is known and recognized, so a later user may acquire rights in areas geographically remote from the first user's territory. *Stone Creek*, 875 F.3d at 436. To take advantage of the *Tea Rose-Rectanus* doctrine, the junior user need only establish good faith use in a geographically remote area. *Id.*

38.     PCHS established priority of use of its trade name and mark in Kitsap, Mason, and Pierce counties, but not in Clallam and Jefferson counties.

39.     The *Tea Rose-Rectanus* doctrine does not apply, however, because, as the Court has already concluded, the parties' trademarks are distinct. The doctrine is an affirmative defense that applies only when trademark infringement has been established. Here, there is no infringement.

## E.     Likelihood of Confusion

40.     The test for likelihood of confusion is "whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.'" *Entrepreneur*, 279 F.3d at 1140 (internal quotation omitted). The Ninth Circuit recognizes an eight-factor test to determine whether a defendant's use of a mark or name creates a likelihood of confusion: (1) strength of the mark; (2) similarity of the marks; (3) proximity or relatedness of the services; (4) accused's intent in selecting the mark; (5) evidence of actual confusion; (6) marketing channels used; (7) likelihood of expansion; and (8) degree of care consumers are likely to exercise. *Sleekcraft*, 599 F.2d at 348–49. "The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1145 (9th Cir. 2011). The "burden of proving likelihood of confusion rests with the plaintiff." *KP Permanent Make-Up*, 543 U.S. at 121.

41.     Given the Court's findings of fact on this issue, PCHS failed to prove likelihood of confusion.

### 1.     *Strength of the Mark*

42.     This factor weighs strongly in favor of OPHS.

### 2. *Similarity of the Marks*

43.     Because the only commonality between the parties' marks are the generic or descriptive terms PENINSULA, HEALTH SERVICES, and use of the evergreen tree, this factor weighs strongly in favor of OPHS.

### 3. *Proximity or Relatedness of Services*

44.     While health services are overlapping, the scope and focus is different, making this factor neutral, or at most tipping slightly in favor of PCHS.

### 4. *Intent in Selecting the Mark*

45.     The evidence conclusively establishes OPHS's independent, good faith in selecting and adopting its trade name and mark. This factor weighs strongly in favor of OPHS.

### 5. *Actual Confusion*

46.     The absence of meaningful evidence of actual confusion weighs heavily against a likelihood of confusion and strongly favors OPHS.

### 6. *Marketing Channels Used*

47.     Because PCHS fails to provide any credible, substantive evidence in support of its claim of overlapping marketing channels, this factor weighs slightly in favor of OPHS.

### 7. *Likelihood of Expansion*

48.     There is no evidence that either OPHS or PCHS has a strong possibility of expansion. This factor weighs strongly in favor of OPHS.

### 8. *Degree of Consumer Care*

49.     This factor at least slightly favors OPHS.

### *9.    Likelihood of Confusion Viewed in Totality*

50.    Viewed in totality, all but one of the *Sleekcraft* factors favors OPHS, including several particularly important factors, as summarized below:

|   | Factor | Weight |
|---|--------|--------|
| 1 | Strength of the mark | Strongly OPHS |
| 2 | Similarity of the marks | Strongly OPHS |
| 3 | Proximity or relatedness of services | Slightly PCHS |
| 4 | Intent in selecting mark | Strongly OPHS |
| 5 | Actual confusion | Strongly OPHS |
| 6 | Marketing channels | Slightly OPHS |
| 7 | Likelihood of expansion | Strongly OPHS |
| 8 | Degree of consumer care | Slightly OPHS |

51.    Overall, after analysis of all *Sleekcraft* factors, there is no likelihood of confusion.

52.    Neither OPHS's word mark nor its design mark infringe upon PCHS's marks.

**F.    Remaining claims 2–4 rise and fall with trademark infringement.**

53.    Claim 1 of the complaint is for alleged trademark infringement of an unregistered mark, also referred to as unfair competition and false designation of origin under 15 U.S.C. § 1125(a). Claims 2–4 all depend on PCHS's allegations of trademark infringement. Dkt. 1 at 6–9. Because, as shown above, PCHS's trademark allegations fail as a matter of law, claims 2–4 are also summarily dismissed.

**G.    Attorney's Fees and Costs**

54.    In addition to costs, the Lanham Act permits an award of attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). "Fees under the Lanham Act are appropriate '[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or

pursued in bad faith.'" *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 816 (9th Cir. 2003) (quoting *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 827 (9th Cir. 1997)).

55.     An award of costs and fees is not warranted against PCHS in this case. This is not an "exceptional case," and PCHS's case was not "groundless, unreasonable, vexatious, or pursued in bad faith." There was a legitimate question presented regarding the similarity of the parties' trademarks, especially given the similar services provided by the two companies. However, PCHS's marks are weak and lack secondary meaning, and PCHS failed to establish priority of use or likelihood of confusion. OPHS's request for attorneys' fees and costs is therefore denied.

***

The clerk shall enter a judgment in Defendants' favor and close the case.

IT IS SO ORDERED.

Dated this 17 day of March, 2023.

_____
BENJAMIN H. SETTLE
United States District Judge